## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

_____

APPLE INC. and NeXT SOFTWARE     )
INC. (f/k/a NeXT COMPUTER, INC.),     )
    )
           *Plaintiffs,*     )         No. 1:11-cv-08540
    )
      v.     )
    )         Judge Richard A. Posner.
MOTOROLA, INC. and MOTOROLA     )
MOBILITY, INC.,     )
    )
           *Defendants.*     )

## ORDER

Before the court are motions for summary judgment regarding nine patents.

**Apple's summary judgment motion regarding U.S. Patent No. 5,319,712 is granted**

Apple has moved for summary judgment of noninfringement of Motorola's U.S. Patent Number 5,319,712 ("Method and Apparatus for Providing Cryptographic Protection of a Data Stream in a Communication System"). The patent discloses a method for encrypting data packets that are sent from one device to another. Claim 17 specifies that the algorithm encrypts each packet according to a function whose inputs are a packet sequence number, a transmit overflow sequence number, and a random encryption key. The sequence number increases with each packet encrypted, to a maximum of 128, at which point it begins anew at 1. The transmit overflow sequence number increases each time the packet sequence number resets.

Motorola alleges that a particular encryption method called Wi-Fi Protected Access ("WPA") used by Apple infringes the method disclosed in the '712 patent. The dominant IEEE 802.11 standard requires devices to be capable of WPA encryption, as well as of other encryption methods. Many of Apple's devices are compliant with the 802.11 standard and therefore capable of performing WPA encryption. The disagreement is over whether the extended initialization value used in the WPA encryption process is the equivalent of Motorola's patented transmit overflow sequence number.

During claim construction Judge Crabb limited "transmit overflow sequence number" in Motorola's patent to an overflow number that is *never* transmitted to

No. 1:11-cv-08540                                                                                    2

the receiver device. Her ruling was based on statements that Motorola had made
to the Japanese Patent Office to distinguish the Japanese counterpart to the '712
patent from prior art. (Claim 9 of the Japanese patent was identical to claim 17 of
the '712 patent.) Motorola told that office that "unlike the key or the packet se-
quence number, there is no chance to intercept the overflow sequence number [a
reference to the 'transmit overflow sequence number' in the '712 patent]; thus it
provides a higher level of security"—no chance because that number is never
transmitted, unlike its counterpart in Apple's devices that are alleged to infringe.

     Foreign patent-prosecution history is relevant even though it must be con-
sidered in light of differences between the foreign patent regime and the U.S. re-
gime. *TI Group Automotive Systems (North America), Inc. v. VDO North America,
L.L.C.*, 375 F.3d 1126, 1136 (Fed. Cir. 2004); *Tanabe Seiyaku Co. v. United States Int'l
Trade Commission*, 109 F.3d 726, 733 (Fed. Cir. 1997). Motorola's statement to the
Japanese Patent Office was motivated not by an idiosyncratic rule of foreign pat-
ent law, cf. *Pfizer, Inc. v. Ranbaxy Laboratories, Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir.
2006), but by the prohibition—applicable under United States as well as Japanese
patent law—against patenting methods that are obvious to someone of ordinary
skill in the relevant field of invention who is acquainted with prior art in that
field. 35 U.S.C. § 103. In order to distinguish the method disclosed in the '712
patent from prior encryption methods, Motorola emphasized to the Japanese
Patent Office the increased security obtained by not transmitting all the encryp-
tion inputs, and specifically by *never* transmitting the transmit overflow sequence
number, Its statement was precise and unequivocal, in contrast to foreign prose-
cution history rejected in cases such as *AIA Engineering Ltd. v. Magotteaux Int'l
S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011), and *Caterpillar Tractor Co. v. Berco, S.p.A.*,
714 F.2d 1110, 1116 (Fed. Cir. 1983). Judge Crabb's construction estops Motorola
to assert a broader interpretation of "transmit overflow sequence number" in this
proceeding. Because the parties agree that the extended initialization value in
WPA is transmitted (and it is the only structure that is potentially analogous to
the patented transmit overflow sequence number), Apple's WPA-capable prod-
ucts do not literally infringe Motorola's '712 patent.

     Pointing to expert opinion that the broadcast of the extended initialization
value does not actually reduce the security of the WPA protocol, Motorola ar-
gues that its infringement claim may still prevail under the doctrine of equiva-
lents. But this contradicts its previous ground for distinguishing its method from
prior art, and if presented to the Japanese Patent Office would have resulted in
rejection of the patent application. "[S]ince, by distinguishing the claimed inven-
tion over the prior art, an applicant is indicating what the claims do not cover, he
is by implication surrendering such [patent] protection." *Ekchian v. Home Depot,
Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997). "[T]he concept of equivalency cannot

embrace a structure that [was] specifically excluded from the scope of the claims." *Decisioning.com, Inc. v. Federated Department Stores, Inc.*, 527 F.3d 1300, 1315 (Fed. Cir. 2008); see also *Asyst Technologies, Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1190 (Fed. Cir. 2005). Motorola relied during the Japanese patent prosecution on a specific narrow characterization of its encryption method—that it did not broadcast the transmit overflow sequence number. The WPA encryption method which Apple's 802.11-compliant devices are capable of performing does not infringe claim 17 of Motorola's patent.

**Apple's motion for summary judgment regarding U.S. Patent No. 5,572,193 is granted**

Apple has moved for summary judgment of noninfringement and invalidity of Motorola's U.S. Patent Number 5,572,193 ("Method for Authentication and Protection of Subscribers in Telecommunications Systems"). The '193 patent describes methods for encrypting communications signals between devices in a cellular network, to enable the network to authenticate calls from cellphone users while preventing impersonation of one cellular phone user by another.

Claims 29 and 31 of the '193 patent have been incorporated into the CCMP ("Counter Mode with Cipher Block Chaining Message Authentication Protocol," more commonly referred to as WPA2—Wi-Fi Protected Access II) component of the IEEE 802.11 standard. Many Apple devices, including iPhones and iPads, comply with the 802.11 standard and so are usable on networks that use WPA2 encryption.

Apple argues that claims 29 and 31 are invalid because they were anticipated by two items of prior art: U.S. Patent Number 5,091,942 (the Dent patent) and the American National Standard's "Financial Institution Retail Message Authentication, X9.19" (the X9.19 reference). There is no factual dispute that both preceded the '193 patent; the question is whether either of them anticipated the limitations in claims 29 and 31. (Motorola says that it is asserting only claim 31, that is, that it is not alleging infringement of claim 29, but claim 31 is dependent on claim 29, so both claims must be analyzed.) Apple must "show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." *Silicon Graphics, Inc. v. ATI Technologies, Inc.*, 607 F.3d 784, 796 (Fed. Cir. 2010).

Claims 29 and 31 are as follows:

> **29.** A method of authenticating a subscriber unit in a communication system, comprising:
> (a) providing the subscriber unit with at least part of a plurality of information bits which uniquely identify a target communication unit;

No. 1:11-cv-08540                                                                          4

   (b) generating an authentication message in the subscriber unit as a function
   of the at least part of the plurality of information bits; and(c) transmitting the
   authentication message and the at least part of the plurality of information
   bits from the subscriber unit to the communication system.

   **31.** The method of claim **29** wherein the authentication message is generated
   in the subscriber unit further as a function of a random number known to the
   subscriber unit.

   Claim 29 describes a method for creating an authentication message—an en-
crypted message that confirms the identity of the cellphone user to the network
and thus prevents impersonation. The user dials on the cellphone ("the sub-
scriber unit") a telephone number; the cellphone creates the authentication mes-
sage "as a function of" the target's phone number and transmits to the network
both the target's phone number and the authentication message. Claim 31 incor-
porates claim 29 and adds that the authentication message must also be created
"as a function of" a random number "known to the subscriber unit." The quoted
phrases—"as a function of" and "known to the subscriber unit"—are the focus of
the dispute between the parties, as it is clear that both the Dent patent and the
X9.19 reference anticipate the other elements of claims 29 and 31.
   The Dent patent describes an algorithm that generates an authentication
message using both a random number that is "known to the mobile station in
advance" and the "dialed digits" of the target's phone number. The question is
whether this description anticipates the "known to the subscriber unit" element
of claim 31. Motorola argues that this phrase cannot be taken literally if it is to
add anything to the claim. Of course, to use a number for encryption the cell-
phone must "know" that number, so the addition of the phrase "known to the
subscriber unit" must signify something more if it is to be given independent
meaning. I think that what "known to the subscriber unit" means is that the
number used for encryption must be "known to the subscriber unit well in ad-
vance of its use"; this excludes, for example, the case in which the network sends
the cellphone a random number immediately prior to the use of the number in
the encryption process, or in which the user must enter a random number into
the phone every time he makes a call. In the Dent patent the random number *is*
known to the cellphone in advance of its use in creating an authentication mes-
sage. The cellphone periodically receives a new random number from the net-
work and stores that number in its memory for use in authentication messages.
So when the authentication message is created as a function of the random num-
ber, the random number is known to the cellphone. That is all that claim 31
claims.
   Motorola points to language in the specification of the '193 patent that dis-
cusses and criticizes prior art in which the random number is generated by the

network and transmitted to the cellphone rather than originating in the cellphone. The criticism—that this "random number transmission required for encipherment necessitates additional communication between [the cellphone and the network] which increases the probability of transmission error and adds a transmission step to the…authentication protocol routine"—is applicable to the process discussed in the Dent patent, and the '193 patent lists the Dent patent as a reference. This shows that Apple was aware of prior art in which the random number is transmitted to the cellphone by the network, and viewed the elimination of that extra transmission step as among its innovations over the prior art. Yet nothing in the specification says where the random number is supposed to come from, by contrast to other numbers that are said to be either dialed in by the user or stored in the cellphone's memory; there is no suggestion that the cellphone is capable of generating random numbers or contains in its memory a list of random numbers.

The drafter of the patent must ensure that the claims reflect all the innovations he seeks to claim; if he fails to include such an element in a claim he has failed to provide sufficient notice of his invention. Language in the specification may be useful in interpreting vague or ambiguous limitations in the claims but cannot add limitations to unambiguous claims. *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005); *Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). Motorola asks me to read into claim 31 "a random number known to the subscriber unit *that was never transmitted from the base station to the subscriber unit*." I can't do that.

Because the "known to the subscriber unit" element of claim 31 is clearly anticipated in the Dent patent and there is no serious question that all other elements of claims 29 and 31 are also anticipated, those claims in the '193 patent are invalid. They are also anticipated by the X9.19 reference, which describes an authentication method for use in electronic financial transactions. A limitation of claim 29 describes the generation of an authentication method "as a function of" the target's telephone number. X9.19 also describes the use of the target communication unit's number in the creation of an authentication message, but uses that number as part of the number to be encrypted by the encryption algorithm—"an authentication element [that] represents the data stream that the authentication algorithm acts upon." I can't see a meaningful distinction between these formulations, and I note that "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

No. 1:11-cv-08540                                                                                      6

**Motorola's motion for summary judgment regarding U.S. Patent No. 7,479,949 is denied**

Motorola has moved for summary judgment determining invalidity or alternatively noninfringement of Apple's U.S. Patent Number 7,479,949 ("Touch Screen Device, Method, and Graphical User Interface for Determining Commands By Applying Heuristics"). This is a patent for applying "heuristics" to the movements of the user's fingers on the screen of touch-screen devices (such as Apple's iPhone) that change the visual field or select files. According to the specification, "in some embodiments, heuristics are used to translate imprecise finger gestures into actions desired by the user." In particular, the patent provides a heuristic for determining whether a user who swipes his finger along the screen of the touch-screen device intends to scroll perfectly vertically or to shift the screen diagonally. Users often wish to scroll vertically, yet it's hard for a user to swipe his finger perfectly vertically; so if the touch-screen device simply shifts the screen in the same exact direction of the user's finger swipe, users who intend to scroll vertically will often instead produce diagonal motions (what the patent calls "two-dimensional screen translation"). The patent's solution is a heuristic that treats "substantially vertical" swipes—swipes that are within a specified range of a perfectly vertical swipe (for instance, within 27 degrees of perfectly vertical)—as commands for vertical scrolling; outside that tolerance swipes produce diagonal motion in the direction of the swipe.

Motorola argues that the '949 patent is invalid because its use of the term "heuristic" renders the patent indefinite, 35 U.S.C. § 112, ¶ 2, and that it is a means-plus-function patent, see § 112, ¶ 6, that fails to indicate any definite structure (for instance, an algorithm for a computer program) in its specification. Indefiniteness is a question of law. *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).

Motorola's primary evidence of indefiniteness consists of statements in depositions of nine of the inventors listed in the patent, most of whom concede that "heuristics" is "sort of a vague word" or are otherwise unable to define it. But defining a word is often more difficult than grasping its meaning in a specific context. It is "particularly inappropriate to consider inventor testimony obtained in the context of litigation in assessing validity under section 112, paragraph 2, in view of the absence of probative value of such testimony." *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000). And in fact some of the inventors were able to define the term (essentially as equivalent to "rule" or "algorithm"), and both parties were able to offer definitions for purposes of claim construction. Apple defined "heuristics" as "one or more rules to be applied to data to assist in drawing inferences from that data," which is an adequate defini-

tion. Section 112 requires invalidation for indefiniteness only where a claim is "insolubly ambiguous" and cannot "be given any reasonable meaning," *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009), quoting *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007), and a claim can be definite even when "reasonable persons will disagree" about its meaning. *Source Search Technologies, LLC v. LendingTree, LLC*, 588 F.3d 1063, 1076 (Fed. Cir. 2009), quoting *Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

Means-plus-function claims are usually identified as such by inclusion of the term "means," and there is a rebuttable presumption that claims that lack that term—such as the claims of the '949 patent—are not means-plus-function claims. The presumption is rebutted if the claim "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Massachusetts Institute of Technology v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006), quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). Patents that claim a means for performing a computer-implemented function must thus thdisclose the algorithm, or "step-by-step process," for performing that function. *Aristocrat Technologies Australia Pty Ltd. v. International Game Technology*, 521 F.3d 1328, 1332–33 (Fed. Cir. 2008); see also *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1314–15 (Fed. Cir. 2011); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005).

The claims in patent '949 gesture toward such a step-by-step process, but don't describe one. The specification does, however, in Figure 39C; and a patent's diagrams can substitute for a written description. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1565 (Fed. Cir. 1991).) Motorola contends that Figure 39C "relates only to the claim limitation relating to vertical scrolling," but that is wrong; it also relates to diagonal movement. The patent does not describe program code to perform the heuristics it claims, but disclosure of code is unnecessary when a person of ordinary skill in the relevant field of invention would be able to write a program to perform the described algorithm without difficulty. *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1214 (Fed. Cir. 2003). Whether that is so here is a disputed question of fact, which therefore cannot be answered in the context of a motion for summary judgment.

Motorola further argues that even if the patent is valid, its products do not infringe because they use a wider tolerance for determining a user's intent to scroll vertically than the example given in Figure 39C—within 33.7 degrees of perfectly vertical rather than 27 degrees. Infringement is a question of fact, *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129–30 (Fed. Cir. 2011), and whether 33.7 degrees is close enough to 27 degrees to infringe Apple's patent, in light of evidence that a small difference in angle affects performance sub-

stantially, is a disputed question that cannot be resolved on summary judgment. *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000). Apple mentions 27 degrees only as an example, moreover; the patent claims are not limited to that angle; hence we need not consider whether, if so limited, Motorola would nevertheless be infringing under the doctrine of equivalents. Motolora's argument that the patent-prosecution history is inconsistent with the charge of infringement fails for the same reason: the language of the patent on which the argument pivots—"based on an angle of initial movement of a finger contact with respect to the touch screen display," which was added after an interview between Apple representatives and the PTO examiner—does not specify an angle.

**Motorola's motion for summary judgment regarding U.S. Patent No. 5,455,599 is granted, and Apple's motion for summary judgment regarding the same patent is denied**

Apple's U.S. Patent No. 5,455,599 ("Object-Oriented Graphic System") is an invention for drawing graphics on an output device (like a display screen). The patented system is "object-oriented," meaning the graphics are produced by a series of objects (such as straight lines and curved lines) that are described mathematically, as opposed to being produced as a series of dots arranged in a pattern. Object-oriented graphics systems allow the programmer greater flexibility to manipulate the graphics.

Apple contends that Motorola products infringe claim 15 and also claim 26 (which however is derivative from 15) of the '599 patent. Motorola counters that the claims are invalid because indefinite, which Apple denies. The controversy revolves primarily around limitation (g) of claim 15, which describes an apparatus for graphic processing that includes "means for capturing state information and rendering information at the grafport object."

"[S]tate information" is information about the graphic's appearance (color, line thickness, etc.); "rendering information," which the parties agree is the "drawing sequence of a graphic object," is instruction to other parts of the device on how to render the graphic (as by rendering a square by drawing a line in a specified way, such as left, up, right, and down from a given point); and the "grafport object" is the interface between the graphic objects and the output system (displays, memory, printers, etc.). The grafport stores the graphic information by "capturing" it into a polymorphic cache; once the information is stored there, the grafport makes it available to other parts of the system. Thus the function of claim 15(g) is "capturing state information and rendering information at the grafport object."

The dispute is over the structure that performs that function. To avoid invalidity for indefiniteness, the patent must describe the structure in the specifica-

tion. *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 947, 950 (Fed. Cir. 2007). Apple argues that the polymorphic cache is the structure—it performs the capturing function. Motorola agrees that information is stored in the polymorphic cache, but counters that this tells us nothing about how the information gets into the cache. Maybe the polymorphic cache does the capturing itself, like a Venus flytrap, or maybe some undisclosed structure captures the information and transports it to the cache for storage. Motorola further argues that even if the polymorphic cache performs the capturing, it captures only state information, and 15(g) requires the capture of both state *and* rendering information.

Motorola points to the following language in the specification: "the graphic port captures state information…into a polymorphic cache." That suggests that the structure for capturing *rendering* information has not been specified, though it also undermines Motorola's argument that the claim is indefinite, because at least it discloses the structure for capturing state information: it is the graphic port that does that capturing. This does not explain precisely how the grafport performs the capturing, but it clearly associates structure with performance, and that is sufficient to defeat Motorola's indefiniteness challenge, *Biomedino, LLC v. Waters Technologies Corp.*, *supra*, 490 F.3d at 950 ("this is not a high bar"); *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002), at least insofar as the capturing of state information is concerned (a vital qualification, as we are about to see). Bearing in mind the Federal Circuit's admonition that the bar is not high for finding a link in the specification between structure and function, I conclude that the graphic port captures state information and stores it in a polymorphic cache.

Apple's expert, Dr. Egbert, argues that the grafport captures rendering information in a polymorphic cache too: "The grafport object, as used in the '599 patent, captures both geometry (rendering information) and state information." Egbert Decl., ¶ 8. But "geometry" and "rendering information" are not synonymous, as the expert opined; nor is rendering information a subset of geometry. An object's geometry tells an output device what to draw: rectangle, line, curve, point, etc. ('599 patent at 8:16–20); rendering information tells the device how to draw it. The patent doesn't "clearly associate" any structure with performance of the function of making rendering information available for producing a graphic.

That invalidates claim 15 (and its derivative claim 26) for indefiniteness—unless we accept Apple's proposed claim construction of "capturing." (The term was not construed at the claim-construction phase of this litigation.) Apple contends that "capturing" is synonymous with "storing," pointing to the term "captured state" in Figure 2 of the patent. "Captured" state is "stored" state all right, but storage is the outcome of capturing; you capture a mutinous sailor, and store him in the brig. Sometimes, it's true, capture and storage are indistinguishable.

Apple argues that when a child captures fireflies in a jar, the structure that per-forms the "capturing" function is the jar, and the jar then stores the fireflies. But while the jar indeed stores the fireflies, the child may have captured the fireflies with a net or with his hands and then placed the captives into the jar. The same ambiguity arises when rendering information is captured "into a polymorphic cache."

Motorola's motion for a summary judgment ruling of invalidity for claims 15 and 26 of the '599 patent are granted, and Apple's motion for a summary judg-ment ruling that the claims are not indefinite is denied.

**Apple's motion for summary judgment regarding U.S. Patent No. 5,311,516 is denied**

Apple has moved for a summary judgment ruling that Motorola's U.S. Pat-ent Number 5,311,516 ("Paging System Using Message Fragmentation to Redis-tribute Traffic") is invalid and in any event that Apple has not infringed it. The patent describes a method for transmitting long messages wirelessly that in-volves chopping the message into sequential data packets, each containing an address and message data, including an indication of whether more packets for that message are on the way. The receiver determines whether a packet is in-tended for it by comparing its own address to the incoming packet's destination address. The patent calls this comparison process "correlation." If there's a suc-cessful correlation, the receiver decodes and stores the packet's message data. When the receiver determines from a packet that no further packets containing data that are part of the message are coming, it deems the chopped-up message complete and thus ready to be read.

Apple contends that the '516 patent is invalid because anticipated by prior art, namely U.S. Patent Nos. 4,908,828 ("Tikalsky") and 4,975,972 ("Mabey")—patents that like the '516 describe methods for transmitting long messages in fragments. The dispute is over whether these earlier patents disclose limitation (d) of claim 1 of the '516 patent, which is "successively storing the decoded mes-sage data of each message packet of the one or more message packets to recon-struct the fragmented message, the fragmented message being completely recon-structed after detection in the decoded message data of one of the…message packets an indication that no more message packets are to be received for the fragmented message." The dispute is over "successively storing," which requires the receiver to receive the packets in their original order; the question is whether the prior art both successively stores packets and satisfies the requirement that reconstruction be complete when the receiver detects that it won't be receiving any more packets containing fragments of the message. Invalidity must of course

be proved by clear and convincing evidence. *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

The Tikalsky patent discloses a system for sending message fragments repetitively to minimize transmission errors, and recommends up to five transmissions of each fragment. If, for example, a message contains 5 fragments, the receiver might receive packets 1 and 4 on the first try, 5 on the second, 2 on the third, and 3 on the fourth, and it will rearrange the series of packets in proper order, thus reconstructing the entire message. The Mabey patent is similar. Apple argues that the method in the Tikalsky and Mabey patents—receiving fragments out of order and then placing them in order—necessarily includes Motorola's simpler method—receiving the packets sequentially. For in the inventions described in those patents, Apple argues, if the first transmission results in the error-free receipt of the entire message (rather than in transmission of just fragments of the message), the fragments will *automatically* be stored sequentially—"successively stor[ed]."

True, the prior art doesn't mention receipt of an error-free message in a single transmission, but Apple argues that such receipt has been "inherently" anticipated—it's "necessarily present" in the anticipating reference. But "inherency… may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient." *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991) (emphasis in original); see also *Schering Corp. v. Geneva Pharmaceuticals*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). But that is all that Apple has shown thus far.

There is also a triable issue of whether the prior art satisfies limitation (d)'s requirement that a message's last packet contain "an indication that no more message packets are to be received." The prior art methods do notify the receiver which fragment occupies the last position in the sequence of packets, but that notification is not "an indication that no more message packets are to be received." Subsequent packets may be received, as in our example in which the fifth packet, which is the last, is received before the second and third.

Asking in the alternative for a ruling of noninfringement, Apple argues that Motorola hasn't presented evidence of any infringement. Motorola must show that it's "more likely than not [that] one person somewhere in the United States had performed the claimed method using [the alleged infringer's] products." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009). By pointing to its expert's tests on Apple's products as well as tests performed by Apple's third-party testing institutions, Motorola has created a triable issue of whether the '516 patent was directly infringed.

Against this conclusion Apple argues that its products don't practice limitations (c) or (d) of claim 1 in the '516 patent. It argues that its products comply

No. 1:11-cv-08540                                                                 12

with Institute of Electrical and Electronics Engineers Standard 802.11 for wireless communication between devices, and that it's not possible both to conform to the 802.11 standard and to practice those limitations. The 802.11 standard calls for certain data (including indications whether more fragments are being sent) to be received and decoded prior to correlation, whereas '516 requires that message data be decoded "in response to a successful [address] correlation." Motorola describes this pre-correlation decoding as merely an extra step above and beyond the steps required by '516. It thus invokes the rule that "absent some special circumstance or estoppel which excludes the additional factor, infringement is not avoided by the presence of elements or steps in addition to those specifically recited in the claim." *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999). Even if this extra step precludes literal infringement, Motorola contends that Apple's products infringe under the doctrine of equivalents because the initial decoding step doesn't alter the invention in any meaningful way. See *Insta-Foam Products, Inc. v. Universal Foam Systems, Inc.*, 906 F.2d 698, 702 (Fed. Cir. 1990). These arguments involve factual disagreements that cannot be resolved on summary judgment.

**Apple's motion for summary judgment regarding U.S. Patent No. 6,359,898 is denied**

Apple has moved for summary judgment of invalidity and noninfringement as to Motorola's U.S. Patent Number 6,359,898 ("Method for Performing a Countdown Function During a Mobile-Originated Transfer for a Packet Radio System").

The '898 patent provides a method for efficiently allocating channels in a wireless communications system. Data are transmitted in small increments of time called "frames." Each frame includes eight "time slots," which are the channels. Each time slot transmits one block (a small quantity of data) per frame; thus a total of eight blocks can be transmitted per frame. A time slot allocated to a given cellphone will transmit one block per frame until the transmission is complete. Multiple time slots can be assigned to a given signal, increasing the speed of the transmission. For example, a transmission of 10 blocks will require 10 frames if the signal is allocated to only one time slot, but only five frames if two time slots are allocated to the signal.

When a transmission is completed, the cellphone no longer needs time slots and the network must reallocate them to other phones (or other devices) that have data to send. The overall speed of the network depends on the network's being able to perform this reallocation efficiently, without downtime between the completion of one transmission on a given time slot and the beginning of another. Because channel and processing delays create a lag time of several frames,

the network needs advance warning of a transmission's impending completion if it is to reallocate its time slots without downtime. A cellphone can give advance warning by indicating in each frame the number of blocks remaining in the transmission. The '898 patent claims methods of providing this advance warning, particularly in cases in which multiple time slots are allocated to a single signal.

Claims 1, 2, and 5 of the '898 patent are at issue. They provide:

> 1. In a wireless communication system, a method for transmitting a communication signal comprising a plurality of units of information [the "blocks"], the method comprising: transmitting the plurality of units of information via a predetermined number of channel resources [the "time slots"]; determining a number of the plurality of units remaining in at least a portion of the communication signal; based on the predetermined number of channel resources, adjusting the number of the plurality of units remaining to produce an adjusted number of units remaining; and transmitting the adjusted number of units remaining to the wireless communication system.

> 2. The method according to claim 1, wherein the step of adjusting further comprises: dividing the number of the plurality of units remaining by the predetermined number of channel resources.

> 5. The method according to claim 1, wherein the predetermined number of channel resources is greater than one.

Apple argues that the '898 patent is invalid because it was anticipated and/or made obvious by prior art, specifically a publication of the communications company Nortel ("the Nortel reference") just over a year before the priority date of the '898 patent. See 35 U.S.C. § 102(b).

The Nortel reference describes a mobile device, such as a cellphone, that begins a transmission by sending a "channel request" to the network, which opens a channel through which the cellphone tells the network how many blocks of data it has to transmit. The network responds by telling the cellphone how many time slots the cellphone has been allocated, the start time for the transmission, and a duration time for each time slot; there may be multiple different duration times because the Nortel reference allows for each time slot to be allocated to a given signal for a different amount of time. Having determined the start time and duration times itself from the number of blocks to be transmitted and the number of time slots allocated, the network knows how long the transmission will last and can reallocate its time slots to other signals upon completion of the transmission.

Apple's anticipation argument fails because the Nortel reference does not anticipate one element of claim 1 of Motorola's patent: "transmitting the adjusted number of units remaining to the wireless communication system." The adjusted

number is calculated by the mobile unit and then transmitted to the network, while in the Nortel reference the network performs the calculation and transmits the adjusted number (the duration times) to the mobile unit. It's true that "wireless communication system" is somewhat ambiguous: throughout the remainder of the '898 patent the phrase is used to refer to the entire system, consisting both of mobile units and of the network's base units, such as communications satellites and cellphone towers. But in the present context that definition makes no sense, because both the base units and the mobile units are part of the wireless communication system, yet one of them must be doing the transmitting. And the "wireless communication system" could hardly be the mobile unit; it must be the base unit or units. By the same token, the term "network" can refer to the entire system, consisting both of users' mobile units and the company's base units, or only to the base units, or to one particular base unit. (Apple does not address its obviousness argument to this element of the '898 patent.) So claim 1 is not anticipated by the Nortel reference, and this conclusion precludes invalidation of claims 2 and 5 as well, which are dependent on claim 1.

Apple makes the further argument that claims 1 and 2 are invalid because indefinite: the step "based on the predetermined number of channel resources, adjusting the number of the plurality of units remaining to produce an adjusted number of units remaining" is incoherent, it argues, and therefore indefinite where only one channel resource (time slot) is allocated to the transmission, because the number of blocks cannot be "adjusted" by the number 1. Multiplication by 1 doesn't do anything. But to "adjust" the number of blocks based on the number of time slots is merely to apply the latter number to the former, for instance by dividing the number of blocks by the number of time slots, as provided in claim 2. Dividing by one, rather than being incoherent or indefinite, is a trivially simple operation. That the quotient will equal the dividend in the particular case does not mean that division by 1 is not a form of adjustment.

Apple further argues that Motorola has failed to create a disputed issue of material fact concerning whether Apple has infringed claim 5. Apple asserts that Motorola must produce evidence that the Apple products are ever assigned more than one time slot by the networks, as is required for violation of claim 5. Motorola may rely on circumstantial evidence in arguing infringement, *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986), abrogated on other grounds by *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc), and a finder of fact may find infringement if at some point during the relevant period if it was "more likely than not [that] one person somewhere in the United States had performed the claimed method using the [accused] products." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009). Motorola has presented evidence from which a jury could find that the

Apple devices are capable of transmitting in multiple time slots and are given the opportunity to do so by their networks at least some of the time.

**Motorola's motion for summary judgment regarding U.S. Patent No. 6,343,263 is dismissed as premature**

Motorola moves for a summary judgment ruling of noninfringement of Apple's U.S. Patent Number 6,343,263 ("Real-Time Signal Processing System for Serially Transmitted Data"). Apple's patent describes a computer system that performs realtime signal processing on serially transmitted data. Claim 1 describes two subsystems—a "host central processing unit" and a "realtime signal processing subsystem"—connected by a realtime application program interface. The realtime API interfaces between the two subsystems, requesting realtime services (for instance, video image processing) from the realtime signal processing subsystem on behalf of applications running on the host subsystem.

Motorola argues that its devices don't infringe because their signal-processing systems lack a realtime API. Underlying the dispute is a claim-construction dispute over the meaning of the term "realtime API." Motorola contends that it's an API that has realtime functionality, which it defines as "constant bit rate handling," while Apple contends the term refers to an API that facilitates realtime signal processing.

Neither party sought construction of the term at the claim-construction hearing, and as a result the motion for summary judgment is premature, and is therefore dismissed. The parties shall submit briefs on construction of the term "realtime application program interface" in claim 1 of Apple's '263 patent no later than January 23.

**Motorola's motion for summary judgment on U.S. Patent No. 5,566,337 is denied**

Motorola has moved for summary judgment of noninfringement of Apple's U.S. Patent Number 5,566,337 ("Method and Apparatus for Distributing Events in an Operating System"). The '337 patent describes a method for distributing "events" between devices in a computer system. An event is "any occurrence in a computer of which software programs running on that computer or on a connected computer need to be informed." Events include keystrokes, mouse clicks, and file modifications. The occurrences are generated by "event producers," and the programs which need to be informed are referred to as "event consumers." A simple example is asking a computer to calculate "2 + 2." The "2" and "+" keys are pressed and the program monitoring keystrokes informs the calculator program, which sends the answer, 4, to the monitor control program, which orders the monitor to display a "4."  Each device could notify all others, but that would

No. 1:11-cv-08540                                                                                              16

involve inefficient communication (especially as the chain of communication grows longer) and risk events being sent out of order. The '337 patent proposes a centralized system with specific structures to keep track of which programs are to be notified, to control the timing of notifications, and to distribute them to the relevant programs.

Claim 1 describes the storage, control, and distribution components of the event-management system, each component being described as a means-plus-function limitation tied to specific structures disclosed in the patent. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). The "storing means" component of the system corresponds (meaning, as *Cardiac Pacemakers* explains, that the specification in the patent "must clearly associate the structure with performance of the function") to what is called the "sequential consumer database" (as well as to a "subscription matrix" not challenged in this motion). The sequential consumer database keeps track of which programs are to be informed of various events and the order in which they are to be informed. (Obviously the word "consumer" does not bear its usual meaning in this context.)

Motorola asks for a summary judgment ruling of noninfringement on the ground that the Android operating system, which runs on its allegedly infringing phones and tablet devices, has no sequential consumer database and thus cannot infringe the '337 patent's event-management method. Summary judgment is warranted if it is clear that the Android operating system lacks any structure identical or equivalent to the sequential consumer database described in Apple's patent. *Commonwealth Scientific & Industrial Research Organization v. Buffalo Technology (USA), Inc.*, 542 F.3d 1363, 1383 (Fed. Cir. 2008).

Apple points to Android structures—"mReceiverResolver" and "the mFilters set of the IntentResolver"—that it contends are equivalent to the sequential consumer database and subscription matrix described in its patent. Its expert, a professor of computer science skilled in the relevant art, opines that these structures are equivalent, and his extended analysis of the Android event-management structures is more than mere *ipse dixit*. Cf. *Tech Search, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002). A reasonable jury could find that the Android operating system's method of tracking event consumers infringes on the storage method disclosed in claim 1. Motorola's expert disagrees, but that creates a factual dispute rather than resolving it. See, e.g., *In re Gabapentin Patent Litigation*, 503 F.3d 1254, 1259–60 (Fed. Cir. 2007).

Motorola argues that its operating system lacks any structure corresponding to the third limitation of claim 1, which describes a "distributor means for receiving the event from the control means and directing said control means to distribute an appropriate event to an appropriate event consumer." Although struc-

tures corresponding to the distributor means were not identified during claim construction, the parties appear to agree that at least one requisite structure must be an API. An API, short for "Application Programming Interface," is a specification allowing various programs to communicate with each another. Since the claim describes communication between programs, an API is necessary to enable it. Apple's expert has opined that specific Android operating system elements are identical or equivalent to Apple's API described above. He has supported his opinion sufficiently to create a material question of fact about whether Motorola's products infringe the thrid limitation of claim 1.

**Apple's motion for summary judgment regarding U.S. Patent No. 6,175,559 is denied in part and deferred in part**

Apple has moved for a summary judgment ruling of invalidity or alternatively of noninfringement of Motorola's U.S. Patent Number 6,175,559 ("Method for Generating Preamble Sequences in a Code Division Multiple Access System"). The '559 patent discloses a method for generating "preamble sequences," which are numbers used to identify cellphones in a cellular division multiple access ("CDMA") system. CDMA enables multiple cellphones to transmit data to cellular towers using the same frequency, thus economizing on bandwidth; but it gives rise to a concern that simultaneous transmissions from multiple cellphones on the same frequency will interfere with each other. The '559 patent describes a method of generating preamble sequences that uses orthogonal codes (codes that minimize interference). The method helps a cellular tower identify, on the basis of the preamble sequence attached to each transmission it receives, which phone sent which transmission,.

Apple manufactures cellphones that communicate on CDMA networks. Motorola alleges that the cellphones' use of the CDMA standard requires preamble sequences to be generated in a manner that infringes its '559 patent. Apple ripostes that the '559 patent is invalid and alternatively that Apple's devices don't infringe the patent.

Apple argues that a preliminary application for U.S. Patent No. 7,173,919 (the Dabak patent) predates the '559 patent's filing date by 26 days and anticipates the method claimed in '559. A preliminary application can establish priority over a later-filed patent if it discloses sufficient detail to cover the latter patent's claims. 35 U.S.C. § 119(e); cf. *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010). But if Motorola can prove that the '559 patent was conceived before the Dabak application date, it regains priority. *Spansion, Inc. v. International Trade Commission*, 629 F.3d 1331, 1356 (Fed. Cir. 2010).

Motorola argues that the '559 patent was actually conceived on June 2, 1999, five days before the Dabak application was filed. It relies on a memorandum to

No. 1:11-cv-08540                                                                                        18

the Motorola patent committee that contains a declaration by the inventor that June 2, 1999, was the date of conception. Apple disputes this evidence. But whatever the date, Motorola has raised significant doubts whether the preliminary Dabak application and subsequent patent sufficiently disclosed the method of the '559 patent "either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Id.* at 1355–56; *Dewey & Almy Chemical Co. v. Mimex Co.*, 124 F.2d 986, 989 (2d Cir. 1942) (L. Hand, J.). The preliminary application is four pages long and does not mention the sequence generators discussed in the '559 patent. And Motorola has submitted an expert opinion (which I rule admissible over Apple's objection) that the Dabak application does not anticipate the '559 patent's claims in sufficient detail to invalidate that patent.

Apple next argues that claims 4 and 5 of the Motorola patent disclose only abstract mathematical manipulations. Mathematical formulae are unpatentable, 35 U.S.C. § 101, if divorced from a new and useful process. *Parker v. Flook*, 437 U.S. 584, 590–91 (1978). But the '559 patent's claims are expressly limited to the process of generating preamble sequences "in a CDMA system," and the '559 patent purports to improve this specific system. These limitations leave many uses of the mathematical formula in the public domain. *Id.*

Apple also requests summary judgment of noninfringement. It compares its phones' actual preamble generation process with the method claimed in the '559 patent and asserts, on the basis of differences between the two methods, that there is no direct infringement. The smallest unit of a preamble sequence is a binary chip. Apple's phones generate preambles chip-by-chip, combining the generated chips with a third number and transmitting the result before repeating the cycle. In contrast, the method disclosed in claims 1, 4, and 5 of the '559 patent consists of forming an outer code and an inner code and multiplying the two together. Read naturally the language of '559 implies generating the codes in their entirety before multiplying them together. But Motorola's expert has explained that one skilled in the art would know how to implement the method described in the '559 patent chip-by-chip, which, if true, revives Motorola's infringement claim.

Apple, however, notes other differences between its preamble generation system and that described in the '559 patent. Its system requires three numbers in its preamble generation system rather than the two claimed in the '559 patent and combines the numbers by means of an XOR operator (expressed in formal logic terms as "P or Q, but not both") rather than the multiplication operator ("P and Q"). And its inner and outer codes are based on single repeated codewords, while the '559 inputs are a "set of Hadamard codewords" and a "set of orthogonal codewords." (Hadamard codewords are a subspecies of orthogonal code-

No. 1:11-cv-08540                                                                        19

words.) But Motorola provides plausible explanations for why these differences are either insubstantial or illusory. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). Since infringement under the doctrine of equivalents is a question of fact, *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129–30 (Fed. Cir. 2011), and a jury could find Motorola's explanations convincing, I reject Apple's argument that no jury could find its products directly infringe the '559 Patent.

Apple further requests a ruling of no contributory infringement, based on Motorola's failure to identify a specific hardware or software component of Apple's devices that has no substantial use apart from uses that infringe the '559 patent. 35 U.S.C. § 271(c); *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1336 (Fed. Cir. 2008). Motorola responds that further third-party discovery is needed to identify such a componen. Having granted Motorola's request for further discovery pursuant to Fed. R. Civ. P. 56(d) (a request that was unopposed), I defer consideration of Apple's motion for summary judgment on contributory infringement until the discovery is completed.

Apple also wants me to rule that there has been no induced infringement. It argues that Motorola has presented no evidence of Apple's "specific intent to encourage another's infringement" of the '559 patent. 35 U.S.C. § 271(b); *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006). But Motorola's expert identified Apple guides that instruct users how to operate their phones on CDMA networks, and that operation is alleged to infringe. A genuine issue of material fact is presented, barring summary judgment on this issue. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1332 (Fed. Cir. 2010); *DSU Medical Corp. v. JMS Co.*, *supra*, 471 F.3d at 1305.

Apple's motion for summary judgment regarding the '559 patent's invalidity and also regarding direct infringement is therefore denied. Regarding indirect infringement the motion is denied in part and deferred in part, as just explained.

So Ordered.

United States Circuit Judge,
Sitting by designation

January 16, 2012